| |
|---|
| **R. C. v Jaffe** |
| 2024 NY Slip Op 31936(U) |
| June 4, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 805288/2018 |
| Judge: Judith N. McMahon |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     HON. JUDITH N. MCMAHON        PART           30M

*Justice*

-------------------------------------------------------------------X

R. C., RACHAEL WISEMAN, JOHN COLASANTE,

            Plaintiff,

        - V -

IRA JAFFE, DANIEL ROSHAN, ROSH MATERNAL-FETAL
MEDICINE, PLLC, NYU LANGONE HEALTH SYSTEM

            Defendant.

-------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 805288/2018 |
| MOTION DATE | 05/23/2024 |
| MOTION SEQ. NO. | 002 003 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 111, 112

were read on this motion to/for        JUDGMENT - SUMMARY        .

The following e-filed documents, listed by NYSCEF document number (Motion 003) 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 113, 114

were read on this motion to/for        JUDGMENT - SUMMARY        .

Upon the foregoing documents, it is ordered that the motions for summary judgment of the defendant Ira M. Jaffe, D.O. (Motion Seq. No. 002), and the defendants Daniel Roshan, M.D., Rosh Maternal Fetal-Medicine, PLLC and NYU Langone Health System (Motion Seq. No. 003), are granted to the extent that the complaint is severed and dismissed as against NYU Langone Health System. Also dismissed are plaintiffs' "Second" (lack of informed consent), and "Fourth" (parental emotional and mental suffering) causes of action, together with all claims against Dr. Jaffe relative to the office visit he conducted, on August 24, 2015. The balance of the motions is denied. Rosh Maternal Fetal-Medicine PLLC remains a defendant as vicariously liable for the negligent conduct, if any is found, on the part of Dr. Jaffe and/or Dr. Roshan.

805288/2018  C., R. vs. JAFFE, D.O., IRA M.
Motion No.  002 003

Page 1 of 12

1 of 12

[* 1]

This medical malpractice action arises out of the prenatal care and treatment rendered to the plaintiff-mother, 42-year-old Rachel Wiseman, who delivered twin daughters[1] on March 22, 2016, at 38 weeks 1 day gestation. The twins, weighing over six pounds each, were delivered by Dr. Jaffe via previously scheduled cesarean section, and demonstrated Apgar scores of 8 and 9 at one and five minutes after birth. Upon delivery, the babies were admitted to the newborn nursery for routine infant care.

On the evening of March 23, 2016, R.C. had an apneic episode while feeding. At 10:00 p.m., the baby desaturated and was transferred to the NICU. An MRI performed on March 24th revealed a large acute left middle territory infarct (*i.e.*, middle cerebral artery or "MCA" stroke) involving the left frontal, parietal and temporal lobes, as well as the insula, basal ganglia, and thalamus. There was mass effect including sulcal effacement and effacement of the left lateral ventricle, but no mid-line shift or herniation. There was no acute intracranial hemorrhage, and the stroke was thought to be thromboembolic. R.C. was released from the hospital on April 1, 2016, and continues to suffer right sided hemiparesis, lower extremity weakness, and its sequelae.

Dr. Jaffe moves for summary judgment on the grounds that he appropriately and thoroughly evaluated plaintiff during his August 14, 2015, and March 16, 2016, office visits, that he appropriately performed the cesarean section on March 22, 2016, and that there was no evidence of excessive force or injury sustained by R. C. at the time of her delivery. Dr. Roshan, Rosh Maternal Fetal-Medicine PLLC and NYU Langone Health System move for summary judgment, maintaining that their care and treatment was consistent with the prevailing standard

---

[1] The babies were monochorionic-diamniotic ("mono/di") twins, meaning that they shared a placenta but had separate amniotic sacs.

805288/2018   C., R. vs. JAFFE, D.O., IRA M.
Motion No.  002 003

Page 2 of 12

2 of 12

[* 2]

of care, and that R.C.'s left cerebral stroke was neither predictable nor foreseeable and was not caused by the defendants' action or inaction. Plaintiff opposes both motions.

In support of Motion Seq. No. 002, Dr. Jaffe submits, *inter alia*, the expert affirmation of an ob-gyn, Henry Prince, M.D. (*see* NYSCEF Doc. No. 53), who opines "with a reasonable degree of medical certainty, that there is nothing in the record to support the contention that any of the treatment rendered by Ira M. Jaffe, D.O. either caused or even remotely contributed to the injuries" claimed to have been sustained by R.C. (*id.*, para. 23) and further, that "while it is generally recognized that mono/di twins should be born no later than 38 weeks, the additional one-day" gestation in this case did not affect R.C.'s outcome (*id.*, para. 12). As for Dr. Jaffe's August 14, 2015 (8 weeks gestation) and March 14, 2016 (37 weeks gestation) office visits, Dr. Prince finds: (1) appropriate monitoring of Ms. Wiseman's glucose; (2) "no evidence of placental insufficiency and the placenta was providing the nutrients the fetuses needed, with no evidence of placental resistance or consequences of a prematurely aged placenta" (*id.*, para. 12), and (3) a normally functioning placenta, as evidenced by the babies' good birth weights, reassuring Apgar scores, and consistent growth (*id.*). Dr. Prince further opines that neither steroids nor magnesium sulfate were indicated in this case, and that "neither advanced maternal age, twin pregnancy, or gestational diabetes are risk factors for neonatal stroke, *even in combination.*" He concludes that no causal relationship exists between the obstetrical management rendered by Dr. Jaffe and the stroke suffered by R.C., which was "neither preventable nor predictable" (*id.*, paras. 18, 20).

In support of Motion Seq. No. 003, defendants Dr. Roshan, Rosh Maternal Fetal-Medicine, PLLC, and NYU Langone Health System submit, *inter alia*, the expert affirmations of

805288/2018 C., R. vs. JAFFE, D.O., IRA M.
Motion No. 002 003

Page 3 of 12

3 of 12

[* 3]

ob-gyn Peter Bernstein, M.D. (*see* NYSCEF Doc. No. 74), and pediatric neurologist, Joseph Maytal, M.D. (*see* NYSCEF Doc. No. 75).

For his part, Dr. Bernstein opines within a reasonable degree of medical certainty that the moving defendants adhered to the acceptable standard of prenatal care by: (1) properly managing plaintiff's advanced maternal age, gestational diabetes, and monochorionic-diamniotic twin pregnancy[2], and (2) performing the cesarean delivery at 38 weeks, as there was no indication to perform it any sooner. According to Dr. Bernstein, R.C.'s left MCA stroke was unpreventable, unforeseeable, and was not caused by defendants' negligence (*id.*, para. 11) as it resulted from a blood clot for which Ms. Wiseman had no risk factors (*id.*, para. 67). He disagrees that the defendants departed from the standard of care by not delivering the twins before 38 weeks "in the setting of 'placental degradation'" since "placental grading is not a standard of care diagnostic tool as there is weak if any correlation between grading and perinatal outcomes" (*id.*, para. 60), and in this case, "there was no premature aging of the placenta or placental degradation" as evidenced by the fact that R.C. grew normally and had no hypoxia or fetal acidemia (*id.*, para. 63).

Dr. Bernstein further opines that there was no indication to deliver the twins on March 19, 2016, during Ms. Wiseman's visit to NYU's emergency department, since her complaints of decreased fetal movement had quickly resolved, the fetal heart monitoring and non-stress tests were reassuring, and the hospital personnel correctly determined that no further testing was required (*id.*, para. 54).

---

[2]     Here, Dr. Bernstein states that "contrary to plaintiff's allegations, it is my opinion...that the defendants performed more than the required amount of prenatal testing and surveillance of this pregnancy" (*id.*, para. 47) and further, that "the standard of care is to bring diabetic mothers as full to close term as possible provided there is good glycemic control, as was the case in this pregnancy" (*id.*).

805288/2018  C., R. vs. JAFFE, D.O., IRA M.     Page 4 of 12
Motion No.  002 003

4 of 12

For his part, pediatric neurologist Dr. Maytal sets forth that the moving defendants adhered to the standard of care as follows: (1) Dr. Jaffe did not use excessive force that could have caused any injury to the infant during delivery, evidenced by the fact that since the middle cerebral artery is located deep within the brain, then in order for any claimed injury to have occurred due to force there would be at the very least a cephalohematoma or other external injury (*id.*, para. 22); (2) placental degradation would have resulted in fetal growth restriction, fetal hypoxia or fetal acidemia, none of which was present in this case, and (3) no medical research exists that establishes a precise blood glucose level or duration of hypoglycemia that has a causal connection to the development of a middle cerebral artery stroke. Dr. Maytal informs that neonatal strokes are very rare, occurring in 1 out of 4000 newborns, and that risk factors for an MCA stroke, which were not present in this case, include coagulation factors in the mother and infant, cardiac lesions, infection, trauma, asphyxia, premature and/or prolonged rupture of membranes, vacuum extraction, emergency cesarean delivery and preeclampsia. Accordingly, this expert also concludes that the infant's stroke "could not be predicted nor prevented" (*id.*, para. 29).

In opposition to both motions, plaintiffs offer the expert affirmation of an ob-gyn (*see* NYSCEF Doc. No. 92), who opines to a reasonable degree of medical certainty that the defendants deviated from the accepted standard of obstetrical care and practice by: (1) failing to plan for the cesarean section delivery of the mono/di twins before 38 weeks gestion; (2) scheduling delivery of the babies on March 22, 2016, at 38 weeks 1 day gestation, and (3) failing to deliver the twins between 34 and 37 weeks. The expert is unequivocal that these departures were a proximate cause in bringing about the left sided MCA stroke suffered by R.C.

805288/2018  C., R. vs. JAFFE, D.O., IRA M.                                    Page 5 of 12
Motion No.  002 003

5 of 12

[* 5]

Plaintiffs' ob-gyn specifically finds, based upon a review of the records, that defendants departed from the standard of care when they failed to adequately monitor, document, and control Ms. Wiseman's glucose levels; failed to prescribe Glyburide on or about December 17, 2015; failed to document the glucose values at least twice a week, and improperly delayed the performance of a glucose tolerance test. Concurring with the opinion of plaintiffs' pediatric neurologist, plaintiffs' ob-gyn finds that R.C. "more likely than not" suffered the stroke *in utero* "at or near the time of the cesarean section delivery, between March 21, 2016 and March 22, 2016, based on her brain imaging performed on March 24th and March 26th which showed that the left-sided MCA stroke was *still in its acute phase* (as evidenced by the degree of swelling in the brain) coupled with her Apgar score where 'zero' was given for color at 1 minute, and the meconium staining found on placental pathology" (*id.*, para 40).

Plaintiffs' expert explains that Ms. Wiseman's poorly controlled gestational diabetes was a proximate cause of R.C.'s stroke because of the changes it made to the vasculature of the placenta. In addition, Ms. Wiseman's advanced maternal age may have increased the viscosity of her blood flow, resulting in an increased risk of blood clot formation. Finally, the expert finds that prenatal sonograms that assessed the placenta to be Grade 2 as early as 22 weeks, along with elevated systolic/diastolic ratios of over 3 starting on or about the 30th week of gestation, provided further indications for a risk of perinatal or neonatal stroke. Accordingly, "the sonograms were not indicative of fetal wellbeing, but indicated impaired blood flow to [R.C.] or placental resistance because of the abnormal s/d rations" (*id.*, paras. 64-66).

Finally, as for plaintiffs' claims against NYU, plaintiffs' ob-gyn expert points out that there is no indication that an MFM consult was called on "this high-risk mono/di pregnancy with maternal complaints of decreased fetal movement" (*id.*, para. 68), and that, contrary to Dr.

805288/2018  C., R. vs. JAFFE, D.O., IRA M.
Motion No.  002 003

Page 6 of 12

6 of 12

Bernstein's opinion, "there was every indication to deliver these twins on March 19th when the mother presented to the NYU Hospital Emergency room complaining of decreased fetal movement" (*id.* para. 68).

In further opposition, plaintiffs submit the affirmation of a pediatric neurologist (*see* NYSCEF Doc. No. 93), who sets forth that R.C.'s perinatal ischemic stroke was more likely than not caused by a blood clot that had traveled to the infant's brain and resulted in a complete and abrupt cut off of blood flow at the M1 segment of the brain's middle cerebral artery, that the stroke occurred *in utero* between March 21st and March 22nd and would have been avoided if the twins had been born between 34 and 37 weeks gestation. The pediatric neurologist is unwavering that "the twin pregnancy alone and/or in combination with gestational diabetes and maternal advanced age are *known risk factors* associated with perinatal ischemic arterial stroke; that twins who share the same placenta is a lead risk factor for adverse events; that the stroke was a proximate cause of R.C.'s seizures, apneic episodes, respiratory distress, latching/breast feeding difficulties [and subsequent] right-sided hemiparesis, cerebral palsy, sensorimotor impairment...devastating deficits on vision, cognition, speech, feeding, swallowing, chewing, language, mobility, ambulation" (*id.,* para. 9).

The standards for summary judgment are well settled. The proponent "must make *prima facie* showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v. New York Univ. Med. Ctr.,* 64 NY2d 851, 853 [1985]; [*internal citations omitted*]). The motion must be supported by evidence in admissible form (*see Zuckerman v. City of New York,* 49 NY2d 557, 562 [1980]), and the facts must be viewed in the light most favorable to the nonmoving party (*see Vega v. Restani Constr. Corp.,* 18 NY3d 499, 503 [2012]). "In determining whether summary judgment is appropriate, the

805288/2018 C., R. vs. JAFFE, D.O., IRA M.
Motion No. 002 003

Page 7 of 12

motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on the issues of credibility" (*Garcia v. J.D. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept. 1992]). Once the movant has met his or her burden on the motion, the nonmoving party must establish the existence of a material issue of fact (*see Vega v. Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]). A movant's failure to make *prima facie* showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*Winegrad v. New York Univ. Med. Ctr.*, 64 NY2d 851 [1985]; [*internal citations omitted*]). It has been held that merely "pointing to gaps in an opponent's evidence is insufficient to demonstrate a movant's entitlement to summary judgment" (*Koulermos v. A.O. Smith Water Prods.*, 137 AD3d 575, 576 [1st Dept. 2016]).

"The drastic remedy of summary judgment, which deprives a party of his day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*DeParis v. Women's Natl. Republican Club, Inc.*, 148 AD3d 401 [1st Dept. 2017]; [*internal citations omitted*]). "It is not the court's function on a motion for summary judgment to assess credibility" (*Ferrante v. American Lung Assn.*, 90 NY2d 623, 631 [1997]).

To sustain a cause of action for medical malpractice, the plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of the claimed injury. A medical provider moving for summary judgment, therefore, must make a *prima facie* showing of entitlement to judgment as a matter of law by establishing the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Frye v. Montefiore Med. Ctr.*, 70 AD3d 15 [1st Dept. 2009]; [*internal citations omitted*]), or by establishing that the plaintiff was not injured by such treatment (*see generally Stukas v. Streiter*, 83 AD3d 18 [2d Dept. 2011]).

805288/2018 C., R. vs. JAFFE, D.O., IRA M.
Motion No. 002 003

Page 8 of 12

8 of 12

[* 8]

To satisfy the burden on the motion, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v. Noble*, 73 AD3d 204, 206 [1st Dept. 2010]). If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and the opinion should specify "in what way" the plaintiff's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v. Lawrence Hospital*, 69 AD3d 403, 404 [1st Dept. 2010]). Once a defendant has made such a showing, the burden shifts to the plaintiff to "submit evidentiary facts or materials to rebut the *prima facie* showing by the defendant" (*Alvarez v. Prospect Hosp.*, 68 NY2d 320, 324 [1986]), but only as to those elements on which the defendant met the burden (*see Gillespie v. New York Hosp. Queens,* 96 AD3d 901 [2d Dept. 2012]). Accordingly, a plaintiff must produce expert testimony regarding the specific acts of malpractice, and not just testimony that alleges "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence" (*Alvarez v. Prospect Hosp.*, 68 NY2d at 325). In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry, or medical standards is sufficient to defeat summary judgment (*Frye v. Montefiore Med. Ctr.,* 70 AD3d 15, 24). Where the expert's "ultimate assertions are speculative or unsupported by any evidentiary foundation, however, the opinion should be given no probative force and is insufficient to withstand summary judgment" (*Diaz v. New York Downtown Hosp.*, 99 NY2d 542, 544 [2002]). The plaintiff's expert must address the specific assertions of the defendant's expert with respect to negligence and causation (*see Foster-Sturrup v. Long*, 95 AD3d 726, 728-729 [1st Dept. 2012]).

Where the parties' conflicting expert opinions are adequately supported by the record, summary judgment must be denied. "Resolution of issues of credibility of expert witnesses and

805288/2018  C., R. vs. JAFFE, D.O., IRA M.
Motion No.  002 003

Page 9 of 12

the accuracy of their testimony are matters within the province of the jury" (*Frye v. Montefiore Med. Ctr.*, 70 AD3d 15, 25; *see also Cruz v. St. Barnabas Hospital*, 50 AD3d 382 [1st Dept. 2008]).

Here, the Court finds that the moving defendants have established entitlement to summary judgment dismissing plaintiffs' complaint by submitting, *inter alia*, the factually based and detailed affirmations of Drs. Prince, Bernstein, and Maytal, who identified the standards of care as adhered to by the respective defendants, and who each opined that the defendants' conduct was not a proximate cause of the injuries alleged.

In opposition, plaintiffs have met the burden of rebutting the defendants' *prima facie* showing by raising a triable issue of fact as to, *inter alia*, the timeliness of the cesarean delivery under the facts presented, and whether the MCA stroke might have been prevented had R.C. been delivered between 34 and 37 weeks. In this regard, plaintiffs' expert ob-gyn and expert pediatric neurologist have furnished detailed reviews of the evidence, including analysis of R.C.'s brain imaging studies, to support their opinion that the MCA stroke occurred *in utero* "at or near the time of delivery" (*i.e.*, between March 21, 2016, and March 22, 2016), since it was still in its *acute phase* on March 24, 2016. A question is raised as to whether R.C. was deprived of her "last clear chance" to avoid the stroke by being delivered beyond 37 weeks.

While evidence of injury alone does not mean that the defendants were negligent (*see Landau v. Rappaport,* 306 AD2d 446 [1st Dept. 2003]), the facts in this record together with the opinions of plaintiff's experts as to the departures from good and accepted medical practice mandates a trial on whether, under the circumstances alleged by plaintiffs (*i.e.*, Ms. Wiseman's advanced maternal age, gestational diabetes and degradation of the placenta as early as 22 weeks), the moving defendants departed from the standard of care by not delivering the mono/di twins between 34 and 37 weeks gestation.

805288/2018  C., R. vs. JAFFE, D.O., IRA M.
Motion No.  002 003

Page 10 of 12

As previously indicated, defendant NYU Langone is awarded summary judgment dismissing the complaint in its entirety. It is undisputed that on March 19, 2016, Ms. Wiseman visited NYU's emergency department with complaints of decreased fetal movement for one day which had resolved upon her arrival to triage. She reported intermittent abdominal cramping/contractions but denied vaginal bleeding or leakage of fluid. Upon assessment intermittent Braxton-Hicks were noted, but the cervix was long and posterior, there was a low concern of labor, and she was deemed hemodynamically stable. Non stress test for overall maternal and fetal status was determined to be reassuring, and Ms. Wiseman was discharged home with instructions to return in three days for her scheduled cesarean section. Here, plaintiff has not pled any specific allegations against NYU and has not identified any NYU employees for whom it would be vicariously liable. As such, the complaint against NYU is dismissed as a matter of law.

The Court has considered plaintiff's remaining arguments and finds them unavailing.

Accordingly, it is

ORDERED that the motion for summary judgment by the defendant, Ira M. Jaffe, D.O., is granted to the extent that plaintiffs' Second and Fourth Causes of Action are severed and dismissed, and the balance of the motion is denied; and it is further

ORDERED that the motion for summary judgment by the defendants Daniel Roshan, M.D., Rosh Maternal Fetal-Medicine, PLLC, and NYU Langone Health Systems is granted to the extent that the complaint and any and all cross claims are severed and dismissed as against NYU Langone Systems; and it is further

ORDERED that plaintiffs' Second and Fourth Causes of Action are severed and dismissed as against Dr. Roshan and Rosh Maternal Fetal-Medicine, PLLC; and it is further

805288/2018  C., R. vs. JAFFE, D.O., IRA M.
Motion No.  002 003

Page 11 of 12

ORDERED that the Clerk is directed to enter judgment in favor of NYU Langone Systems

dismissing the complaint; and it is further

ORDERED that the parties appear for a virtual pre-trial conference via Microsoft Teams

on **July 23, 2024, at 12:30 p.m.**

| 6/4/2024 | | JUDITH N. MCMAHON, J.S.C. |
|----------|--|---------------------------|
| DATE | | |

CHECK ONE: ☐ CASE DISPOSED   ☒ NON-FINAL DISPOSITION

                 ☐ GRANTED   ☐ DENIED   ☒ GRANTED IN PART   ☐ OTHER

APPLICATION: ☐ SETTLE ORDER   ☐ SUBMIT ORDER

CHECK IF APPROPRIATE: ☐ INCLUDES TRANSFER/REASSIGN   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

Hon. Judith N. McMahon
J.S.C.

805288/2018  C., R. vs. JAFFE, D.O., IRA M.
Motion No. 002 003

Page 12 of 12